UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES LOCAL 2401, *et al.*,

    Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

    Defendant.

Civil Action No. 09-CV-1804 (BJR)

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case concerns allegations of age and race discrimination against the District of Columbia (hereinafter "Defendant" or "the District") in connection with a reduction-in-force ("RIF") at the District of Columbia Department of Health Care Finance (hereinafter "DHCF"), as well as the hiring of personnel into newly created positions at DHCF after the RIF. Plaintiffs—African-American DHCF employees whose positions were eliminated in the RIF and who were not rehired into newly created positions—allege that there was intentional age-and race-based discrimination in both the RIF and the rehiring process, in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act ("DCHRA").[1] *See generally* Third Amended Complaint (Dkt. No. 34) ("Comp."). Before the Court is Defendant's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. Having reviewed the motion, opposition, and reply thereto, the entire record in the case, and the applicable law, the Court GRANTS Defendant's motion for summary judgment.

---

[1]     Local 2401 of the American Federation of State County and Municipal Employees, the union that represents the individual Plaintiffs, is also a Plaintiff in this action.

## II. FACTUAL BACKGROUND[2]

Prior to the creation of DHCF, Medicaid and the D.C. Healthcare Alliance—which together provide health care services for one in three District citizens—were primarily administered by the Medical Assistance Administration ("MAA") within the D.C. Department of Health. *See* Defendant's Statement of Material Facts Not in Dispute (Dkt. No. 98) (hereinafter "Def.'s St. Facts") at ¶ 1. It is undisputed that under MAA, the administration of health care services was frequently mishandled, resulting in significant over and under payments on service claims, as well as under-reimbursement from federal programs. *Id*. at ¶ 2. Accordingly, in 2007, the Mayor of the District of Columbia signed into law the Department of Health Care Finance Establishment Act of 2007 to create a new agency—DHCF—to centralize and improve the administration of health care services in the District. *Id*. at ¶ 3.

Thereafter, the District retained a team of consultants from the George Washington University ("GW") School of Public Health and Health Services to assist the District in establishing DHCF and transitioning the services from MAA to DHCF. *Id*. at ¶¶ 6-7. Ultimately, a Transition Plan was developed that structured DHCF along "functional lines" meant to

---

[2] Unless otherwise noted, the factual allegations set forth herein are drawn from Defendant's Statement of Material Facts Not in Dispute (Dkt. No. 98-2) (hereinafter "Def.'s St. Facts"). In this Statement, Defendant sets forth in 63 paragraphs what it alleges to be the material undisputed facts in this case. *Id*. Plaintiffs do not challenge the factual allegations raised in 38 of the 63 paragraphs. *See* Plaintiff's [*sic*] Statement of Material Facts in Dispute (Dkt. No. 100-1) (hereinafter "Pls.' St. Facts"). Accordingly, the factual allegations contained in those 38 paragraphs are deemed admitted. *See, e.g., Sloan v. Urban Title Services, Inc*., 689 F. Supp. 2d 123, 127 (D.D.C. 2012) (deeming admitted any facts identified by defendant that were not disputed by plaintiff). Plaintiffs did challenge the factual allegations in 25 of the 63 paragraphs. However, significant issues exist with respect to the challenges raised by Plaintiffs. Initially, while Plaintiffs contend that the factual allegations in paragraphs 42-43, 45, and 51 are in dispute, Plaintiffs fail to support their challenge to these allegations with any citation to the record. Accordingly, the factual allegations in paragraphs 42-43, 45, and 51 are deemed admitted. *Id.* at 127. As to Plaintiffs' remaining challenges, the Court notes that a significant number of the countervailing "facts" to which Plaintiffs direct this Court's attention: (1) are not supported by the evidence to which Plaintiffs cite, (2) do not address the factual allegation raised by Defendant, and/or (3) do not create a dispute of fact. *Compare*, .*e.g*., Def.'s St. Facts ¶ 19 ("Managers and human resources personnel at DHCF as well as at the Department of Health were given input into position descriptions for new positions at the agency.") with Pls.' St. Facts ¶ 19 ("Despite management and human resources personnel input, the District failed to comply [*sic*] its personnel rules, including recertification, reclassification and the District's anti-discrimination laws."). In such instances, the Court deems Defendant's proffered facts admitted. *Sloan*, 689 F. Supp. 2d at 127.

improve the quality and availability of health care to District citizens, as well as "correct the financial and audit challenges" facing the District. *Id*. at ¶¶ 11, 13. After DHCF's organizational structure was established, the GW consultants developed an organizational chart to implement the changes envisioned by the Transition Plan. *Id*. at ¶ 14.

DHCF's organizational structure included new positions that had not previously existed at MAA and eliminated some positions that had existed within MAA. *Id*. at ¶¶ 15-17, 31-32. Plaintiffs do not dispute that the GW consultants were primary responsible for drafting the job descriptions for the newly created positions in DHCF. *Id*. Nor do Plaintiffs dispute that, at the time that the determination was made as to which positions would be eliminated in the RIF, the GW consulting team members did not know the identities of the employees who held those positions. *Id*. at ¶ 32.

DHCF assumed MAA's responsibilities on October 1, 2008 and thereafter the RIF was implemented. *Id*. at ¶¶ 22, 29-30. Seventy-nine positions were eliminated in conjunction with the RIF and sixty-two positions were created. *Id*. at ¶¶ 29-30. It is undisputed that agency employment records demonstrate that the race and age of DHCF's workforce before and after the RIF remained the same. *Id*. at ¶ 37. More particularly, before the RIF, 47.58% of DHCF's employees self-identified as African-American; after the RIF, 47.58% of DHCF's employees self-identified as African-American. *Id*. Likewise, before the RIF, 46 was the median age of DHCF's employees; after the RIF, 46 was the median age of DHCF's employees. *Id*.

In addition, DHCF notified its employees of the impending RIF one month before it implemented the RIF. *Id*. at ¶ 33. The employees whose positions were slated for elimination were encouraged to apply for one of the newly created positions and were given priority in hiring for those positions. *Id*. at ¶ 38-39. Forty-seven of the seventy-nine employees whose positions

were eliminated by the RIF were rehired into new positions at DHCF. *Id.* at ¶ 41. Plaintiffs are seventeen of the thirty-two former DHCF employees whose positions were terminated, but who were not rehired into any of the newly created positions.[3] It is undisputed that five of the seventeen Plaintiffs did not apply for a new position within DHCF or, in the case of one Plaintiff, applied but then withdrew from consideration for the position. *Id.* at ¶ 47. This lawsuit followed on September 21, 2009. Dkt. No. 1.

## III. DISCUSSION

### A. Summary Judgment Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The mere existence of *any* factual dispute will not defeat summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 29 (D.D.C. 2013) (quoting *Anderson*, 477 U.S. at 247–48) (emphasis in original). A fact is material if, under the applicable law, it could affect the outcome of the case. *Olatunji*, 958 F. Supp. 2d at 29. A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 29-30 (quoting *Anderson,* 477 U.S. at 255). However, the nonmoving party must establish more than "the existence of a scintilla of evidence" in support of its position, *Id.* at 30, and the inferences drawn from the

---

[3] Originally there were thirty individual Plaintiffs in this lawsuit. However, thirteen of the original Plaintiffs were dismissed from the case for failure to respond to discovery requests. *See* Dkt. No. 75.

4

evidence "must be reasonably probable and based on more than mere speculation." *Rogers Corp. v. E.P.A.*, 275 F.3d 1096, 1103 (D.C. Cir.2002) (citations omitted). In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). He must present specific facts that would enable a reasonable jury to find in his favor. *Id*. If the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

## B. Plaintiffs' Claims

As a preliminary matter, this Court notes that Plaintiffs' opposition to Defendant's summary judgment motion largely consists of conclusory statements, with little citation to evidence in the record. Indeed, rather than refer this Court to evidence in the record, Plaintiffs cite to their own pleadings. It is black letter law that Plaintiffs may not rest upon the allegations asserted in their pleadings, but must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *District Intown Props., Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusionary statements lacking any factual basis in the record.").

With this in mind, the Court now turns to the merits of Plaintiffs' arguments. As discussed above, Plaintiffs bring three claims for relief. First, Plaintiffs filed an equal protection claim under 42 U.S.C. § 1983 based on the District's alleged age-and-race-based discrimination. Specifically, Plaintiffs allege that the District violated their right to the equal protection of the laws as enshrined in the Fourteenth Amendment by "illegally reorganize[ing] DHCF in such a way as to selectively terminate more senior African-American employees while simultaneously

5

protecting and excluding less senior, inexperienced, predominately Caucasian employees" from the RIF. Third Am. Comp. at ¶ 29. Plaintiffs further charge that the District "reclassifi[ed] [] jobs and grade levels" to effectively disqualify "incumbent African-American employee Plaintiffs from consideration for so called new (redefined) positions, resulting in their constructive discharge and exclusion from 'newly created' positions." *Id*. at ¶ 30.

Second, Plaintiff filed a race-based discrimination claim under 42 U.S.C. § 1981 based on the District's alleged interference with the collective bargaining agreement between the District and Plaintiffs' union, AFSCME. With respect to this claim, Plaintiffs allege that the District "acted pursuant to a formally adopted policy" to implement "a racially and age biased 'realignment' plan" that "reclassifi[ed] jobs, diminish[ed]/lower[ed] Plaintiffs' ratings and qualifications or skills, in order to effectively eliminate their positions and/or preclude their rehiring." *Id*. at ¶ 36. Plaintiffs charge that the District's actions "impeded Plaintiffs' enjoyment and protections articulated in the terms and conditions of the [collective bargaining agreement]." *Id*. at ¶ 37. Lastly, Plaintiff charge that the District violated the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*. (hereinafter "DCHRA") because it "acted in violation of D.C. laws of [*sic*] governing Reductions-in-Force." *Id*. at ¶ 41.

The familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to § 1981, § 1983, and DCHRA cases where, as here, a plaintiff presents only circumstantial evidence that discrimination caused an adverse employment action.[4] *Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008) (applying the *McDonnell Douglas* framework to § 1981 claims); *Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 60 (D.D.C. 2008) (§ 1983 case applying *McDonnell Douglas*); *Paquin v. Federal Nat.*

---

[4] Plaintiffs acknowledge that "there is no direct evidence per se of discrimination." Pls.' St. Facts at ¶¶ 56-59.

6

*Mortg. Ass'n*, 119 F.3d 23, 27 (D.C. Cir. 1997) (applying *McDonnell Douglas* to a DCHRA case). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by showing that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell–Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006). The burden then shifts to the employer to articulate a "legitimate, nondiscriminatory" justification for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Where an employer offers "clear and reasonably specific" nondiscriminatory reasons for the adverse employment action, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981), the court "should not decide whether the plaintiff has made out a prima facie case," and should instead "proceed[ ] to the ultimate issue of [discrimination] vel non." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009). Finally, where a plaintiff can establish a predicate constitutional violation under § 1983, a municipality such as the Defendant in this case is liable only for "action pursuant to official municipal policy." *Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir.1997) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978)).

Here, Defendant does not challenge whether Plaintiffs have established a prima facie case for discrimination; rather, it offers a legitimate, non-discriminatory reason for the adverse employment actions: as Defendant explains, MAA's mismanagement of the District's local and federal public health service programs cost the District "millions of dollars" and resulted in negative audit findings that "jeopardized the city's bond rating." Def.'s Mot. at 3. DHCF was created to "fix the problems and shortcomings of the existent system," which included terminating seventy-nine positions and creating sixty-two new positions. *Id*. at 4-5. Defendant

7

points out that the reason for the realignment is laid out in "exhaustive detail in the Mayor's Transition Plan," which was submitted to the Council for the District of Columbia for approval more than a year before the RIF took place. *Id*. at 13. What is more, the Defendant argues, the decision as to which positions were eliminated in the RIF was made by many individuals from multiple District agencies, as well as the GW consulting team. These decision-makers, Defendant contends, did not know which employees were in the positions slated for elimination. In other words, according to Defendant, the determination was made without consideration of race or age.

Defendant further argues that its lack of discriminatory intent in conducting the RIF is underscored by its emphasis on rehiring the individuals who were displaced as part of the RIF. "Employees subject to the RIF were given a list of vacancies, information on applying, a training session, and 'at least 8 hours of administrative leave to work on resumes and applications.'" *Id*. at 15. In addition, the displaced employees were given priority consideration for reemployment at DHCF. *Id*. What is more, Defendant claims, DHCF chose to post internally (exclusively) forty-four of the sixty-two new positions created, thereby increasing the likelihood that the displaced employees would be rehired. *Id*. This led to almost 60% of the displaced employees being rehired within DHCF with little or no break in employment. *Id*. Defendant alleges that it would likely have been a greater percentage, but 20% of the displaced employees (including five of the 17 Plaintiffs in this case) chose not to apply for a new position. *Id*. at 15, 16 n. 6. Finally, the District points out that it is undisputed there was no appreciable change in the demographics of DHCF's workforce after the RIF and rehiring occurred (noting that the median age of DHCF employees was 46 before and after the RIF, and the number of DHCF employees self-identifying as "Black, not of Hispanic origin" was 47.58% before and after the RIF). *Id*. at 15-16.

Plaintiffs concede that the District's healthcare system was poorly administered under MAA. Nevertheless, they charge that the District's asserted nondiscriminatory reason for creating DHCF is pretextual, and that the true reason that the District implemented the RIF and created new positions was so that it could get rid of "incumbent and older African American employees" and replace them with "younger, inexperienced Caucasian" employees. Pls' Opp. at 1-2. Plaintiffs direct this Court's attention to the following "facts" that they allege are both material and in dispute, in support of their claim that the District's proffered reason is pretext for discrimination:

1. The District only superficially changed job descriptions so that it could list them as "new positions";

2. The District failed to provide "incumbent employees" with an opportunity to review and appeal the job description and classification of the new positions;

3. "[P]reserve[ing] the employment of [DHCF's] existing employees" was not a priority for DHCF;

4. Human Resources at DHCF, not the GW consultants, had the primarily responsibility for drafting the job descriptions for the new positions;

5. The GW consultants did not determine which positions would be eliminated in the RIF;

6. GW consultant team members were hired into the newly created DHCF positions;

7. DHCF intentionally omitted approximately 17 employees from its "retention register";

8. Plaintiff Eric Walcott was told at one of DHCF's job fairs that some of the new positions, including the one to which Mr. Walcott was applying, had already been filled prior to the job fair;

9. Mr. Walcott was not included on DHCF's "Displaced Employee and Preferred List," meaning he was not given priority treatment for hiring into the new positions;

10. Another Plaintiff, Clement Eyo, applied but was not selected for one of the new positions; instead, the position went to a lesser qualified candidate; and

11. The individuals who were hired into the new positions were hired because they are Caucasian and friends of the DHCF Director.

A number of these alleged factual disputes can be dispensed with quickly. For instance, in number 4 above, Plaintiffs dispute that the GW consultants had primary responsibility for drafting the job descriptions for the newly created positions; yet, later in their opposition, Plaintiffs concede that the "GW Consultants were primarily responsible for creating the new positions for DHCF." Pls.' Opp. at 12. Accordingly, this is not a disputed fact.[5]

In addition, several of the above alleged disputes of fact are not supported by citations to the record. For instance, in number 6, Plaintiffs allege that GW consultant team members were hired into the newly created DHCF positions. As evidence of this, Plaintiffs allege that Jessica Schubel, one of the GW consultants, "began working at DHCF in 2009." Pls.' Opp. at 12 (citing Schubel deposition transcript ("Schubel Tr." at 13). However, Plaintiffs' citation to the record in support of this allegation does not support Plaintiffs' claim that Ms. Schubel worked at DHCF, let alone that she was hired into one of the newly created positions. Instead, the record simply states that Ms. Schubel was hired by "the District of Columbia." Schubel Tr. at 13. Moreover, Plaintiffs cite to no evidence in the record demonstrating that other GW consultants were hired by DHCF into the newly created positions.

---

[5] Defendant also alleges that the GW consultants had the "primary responsibility for … determining what positions within DHCF were unnecessary." Def.'s Mot. at 4. Plaintiffs dispute this, arguing that it was DHCF, not the GW consultants who determined which positions would be eliminated in the RIF. In support of their claim that DHCF determined which positions would be eliminated, Plaintiffs point out that the head of the GW consulting team, Patricia MacTaggert, testified that "she did not consider existing jobs" within DHCF as part of the GW team's review of the agency's organization. In Plaintiffs' view, this means that the GW consultants could not have had primary responsibility for determining which positions would be eliminated. Plaintiffs mischaracterize Ms. MacTaggert's testimony. She did not testify that she did not consider "existing jobs" within DHCF, she testified that she did not "look at [current] job descriptions," a different statement entirely. *See* Patricia MacTaggert deposition ("MacTaggert Tr.") at 22. However, the Court also notes that Defendant did not provide evidentiary support for its contention that the GW consultants had primary responsibility for determining which positions would be eliminated. Defendant cites Ms. MacTaggert's affidavit in support of its contention; Ms. MacTaggert's affidavit is silent on this issue. As such, the Court will disregard Defendant's claim that the GW consultants had primary responsibility for deciding which positions would be eliminated in the RIF.

Similarly, Plaintiffs allege that DHCF intentionally omitted approximately 17 employees from its "retention register," (alleged fact number 7 above), declaring in an incomplete sentence: "Defendant's intentional omission of approximately seventeen (17) or more similarly-situated Caucasian employees hired within the one year immediately preceding the Reduction in Force ("RIF")." Pls.' Opp. at 13. Not only do Plaintiffs fail to explain the significance of this alleged fact, they fail to cite to any evidence in the record in support of this allegation.[6] As such, Plaintiffs' alleged fact numbers 4, 6, and 7 do not constitute a dispute of material fact that prohibit summary judgment.

The Court will now address the remainder of the "disputed facts" to which Plaintiffs cite in support of their claim that Defendant's proffered reason for creating DHCF was merely pretext for discrimination. First, Plaintiffs claim that the job descriptions for the newly created positions were only "superficially" revised from the descriptions of the eliminated positions. Plaintiffs argue that this is evidence that Defendant created DHCF simply so that it could create the new positions, thereby "circumvent[ing] the inconvenient obstacle of terminating tenured employees for cause." Pls.' Opp. at 9. As evidence of this, Plaintiffs point to the deposition testimony of Lewis Norman, a Human Resources Specialist with the District and the Defendant's designated Rule 30(b)(6) witness. However, this Court has carefully reviewed those portions of Mr. Norman's deposition transcript to which Plaintiffs cite, and there is nothing in the cited evidence that even remotely suggests that the job descriptions were modified in order to further a discriminatory agenda on Defendant's part.[7] Next, Plaintiffs argue that DHCF Director, Julie

---

[6] Plaintiffs list the 17 individuals whom they believe were excluded from this "retention register," and claim that the names of the 17 individuals was provided in a letter from Plaintiffs' union. However, the letter is not included in the record or otherwise provided for this Court's review. *See* Pls.'s Opp. at 13, fn. 2.

[7] What is more, Plaintiffs failed to attach complete portions of the cited transcript as an exhibit. For instance, Plaintiffs refer this Court to a response that Mr. Norman gave on page 152 of his deposition transcript, but fail to attach the complete response. *See* Lewis Norman Deposition Transcript, Dkt. No. 100 at 9, Ex. 9 at p. 152 (response cutting off at mid-sentence).

Hudman, admitted that she "was not concerned with preserving the employment of current employees in the reorganization" and this admission, according to Plaintiffs, is evidence that Defendant's proffered reason is pretext for discrimination. Pls' Opp. at 10. However, once again, this Court's review of the cited portion of Ms. Hudman's deposition transcript reveals no facts upon which a reasonable jury could deduce that the RIF and subsequent rehiring was the result of discriminatory intent. *Id*.

Next Plaintiffs cite to the interrogatory responses of one Plaintiff, Mr. Walcott, as further evidence that Defendant was motivated by discriminatory intent. Dkt. No. 100, Ex. 15. As a preliminary matter, this Court notes that the interrogatory responses contain multiple unsworn, out of court statements that were allegedly made by DHCF employees and that are offered for the truth of the matter asserted. Plaintiffs have not identified any hearsay exception that would allow the Court to consider these statements, much less carried their burden of showing that such an exception applies. Nevertheless, even if this Court were to assume the veracity of such statements, the statements, along with the remaining allegations in Mr. Walcott's interrogatory responses, are not sufficient to create a dispute of material fact.

This is because nowhere in the interrogatory responses does Mr. Walcott even allege (let alone cite to evidence in the record) that he was terminated and later not rehired because of his race or age.[8] Instead, Mr. Walcott's own interrogatory responses offer a nondiscriminatory reason for why he was not rehired. *Id*. at 15 (noting that the co-worker who interviewed him for the newly created position did not like him because a project had once been taken from the co-worker and given to Mr. Walcott).

---

[8] At most, Mr. Walcott alleges that he told a co-worker that the "disproportionate impact of [the RIF] takes on a racial overtone." *Id*. at 13. This statement, without more, is not sufficient to raise a dispute of material fact.

Mr. Walcott does allege in his interrogatory responses that he was not included on DHCF's Displaced Employee and Preferred List. *Id*. at 14. But, once again, Mr. Walcott does not allege that this "oversight" was the result of discriminatory animus. Although failure to follow procedures, as appears to be the case here, can be circumstantial evidence that an employer's stated explanation is pretextual, the employee must also provide sufficient evidence that the offered explanation is pretext for discrimination. *See Evans v. Sebelius*, 716 F.3d 617, 623 (D.C. Cir. 2013) (even when employee demonstrates that a hiring decision "was procedurally flawed, … she must still provide sufficient evidence that the government's proffered explanation is pretext for *racial* discrimination") (emphasis in original). Here, Mr. Walcott does not allege discriminatory intent, and Plaintiffs have failed to cite to any evidence in the record that would allow a reasonable jury to find that Mr. Walcott's exclusion from the Displaced Employee and Preferred List was anything other than a simple mistake.

Lastly, Mr. Walcott alleges in his interrogatory responses that while he was at a DHCF job fair, he was told by then-Director of the Medicaid Administration, Bob Maruca, that a number of the newly created positions had already been filled "by a select group of people" who, Mr. Walcott claims, had two things in common: they were (1) Caucasian, and (2) friends of the DHCF Director. Dkt. No. 100, Ex. 15 at 12. Once again, this statement, without more, is insufficient for a reasonable jury to conclude that the RIF and rehiring process was motivated by race-and age-based discrimination. Plaintiffs have failed to provide any of the evidence necessary for a jury to reach such a decision, namely: (1) Plaintiffs applied for the positions offered at the job fair, (2) Plaintiffs were qualified for the positions; (3) who was hired into the positions; (4) what the age and race is of those individuals; and (5) Plaintiffs were more qualified for the positions than those individuals. In short, Mr. Walcott's interrogatory responses contain

only his personal conclusions, conclusory allegations, bare assertions, and subjective beliefs. They do not include any specific facts to support these conclusions, allegations, and beliefs, and as such, do not create an issue of material fact.

Next, Plaintiffs contend that Plaintiff Clement Eyo's statements in an email to District Human Resources Director Brender Gregory are evidence of discrimination. Specifically, in his email, Mr. Eyo stated that he was denied a new position for which he applied because his name was removed from the list of individuals being considered for the position and replaced with "the name of the person [DHCF] intended to give the job to." Dkt. No. 100, Ex. 16 at 2. However, review of Mr. Eyo's email shows that it is completely devoid of any suggestion that the RIF and rehiring process was tainted by race- or age-based discrimination. Accordingly, Mr. Eyo's email is insufficient to raise a dispute of fact.

Lastly, Plaintiffs cite to an email from Candice Young, a former HR Advisor in the District's Human Resources Office, dated January 2, 2010. Dkt. No. 100, Ex. 11. In the email, Ms. Young accuses the Human Resource Office of hiring improprieties. *Id*. But, once again, there are no allegations that the improprieties were motivated by race and/or age discrimination. *Id*. Instead, Ms. Young specifically states that the improprieties were due to cronyism. *Id*. ("I then stated that I would no longer have anything to do with bringing people on board just because they were friends of the Director."); ("Our current employees…were losing their jobs because we wanted to hire friends of the administration."). Even if the Court were to assume that Ms. Young's claims of cronyism are accurate, such statements do not create a dispute of fact as to whether the RIF was motivated by race-and age-based discrimination. Cronyism, while disfavored, is not illegal. *See Barry v. Moran*, 661 F.3d 696, 708 (1st Cir. 2011) ("[A]n employment decision motivated by cronyism, not discrimination, would be 'lawful, though

14

perhaps unsavory.'") (quoting *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 587 (1st Cir. 1999), *abrogated on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003); *Neal v. Roche*, 349 F.3d 1246, 1252 (10th Cir. 2003) ("[E]mployers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory.").

Finally, the Court notes that Plaintiffs fail to address whatsoever the undisputed fact that there is **no** difference—significant or otherwise—between the demographics of DHCF's workforce before and after the RIF. Def.'s St. Facts ¶ 37. As previously stated, the median age of DHCF employees was 46 before the RIF and 46 after the RIF; the number of DHCF employees self-identifying as "Black not of Hispanic origin" was 47.58% before the RIF and 47.58% after the RIF. *Id*. Plaintiffs' complete failure to address this issue—alone—is sufficient to warrant summary judgment for Defendant. *See Aliotta v. Bair*, 614 F.3d 556, 565 (D.C. Cir. 2010) (upholding an award of summary judgment because employees' "statistics could not support an inference of discrimination).

## IV. CONCLUSION

For the foregoing reasons, this Court HEREBY GRANTS Defendant's Motion for Summary Judgment (Dkt. No. 98). Plaintiffs' claims are DISMISSED with prejudice.

Dated this 26th day of March 2014.

Barbara Jacobs Rothstein
U.S. District Court Judge

15